## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE GENTIVA HEALTH SERVICES, INC. DERIVATIVE LITIGATION | ) ) ) ) Lead Case No. 1:11-cv-03429-SCJ |
| This Document Relates to: | ) ) |
| ALL ACTIONS | ) ) |
| _____ | ) |

## <u>VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT</u>

1.     Plaintiff Siew K. Stevens ("Stevens") and Joe Cuzzola ("Cuzzola") (collectively "Plaintiffs"), by and through their undersigned attorneys, hereby submit this Verified Consolidated Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Gentiva Health Services, Inc. ("Gentiva" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from July 2008 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.     According to its public filings, Gentiva is a home health agency (an "HHA") that provides home health services and hospice care in the U.S.  The Company offers skilled nursing and therapy services, paraprofessional nursing

- 1 -

services, and homemaker services primarily to adult and elderly patients through licensed and Medicare-certified agencies.   Throughout the Relevant Period, Gentiva's Home Health Segment was its largest segment.  For example, in 2009, **nearly 94%** of the Company's revenues were derived from this segment.

3.     Critically, the Company materially relies upon the assistance of the federal government and, thus, in reality, every single U.S. taxpayer.  For instance, in 2009, Gentiva received total Medicare revenues of almost $774 million, or 82%, of Gentiva's total revenues for 2009.  Further, out of this $774 million, $607 million came specifically from home health episodes with therapy reimbursements. Thus, defendants were well-aware during the Relevant Period (and consistently warned Gentiva stockholders) that compliance with Medicare's stringent rules and regulations was, and is, critical to the very existence of the Company.

4.     The Centers for Medicare & Medicaid Services (the "CMS") establishes the rates Gentiva and other HHAs receive for the in-home services provided to patients under the home health prospective payment system (the "PPS").  Under the PPS, Medicare reimbursements are calculated based on several factors, including the severity of a patient's health and the level of care he or she requires.

5.      However, contrary to the CMS's intent, before and during the

Relevant Period, the most substantial factor in determining a Medicare reimbursement became the number of home therapy visits that HHAs (such as Gentiva) would provide patients within a sixty-day treatment period (an "Episode"), and certain additional amounts would be paid when patient care reached a certain threshold. For instance, from 2000 through 2007, an HHA essentially received the same fee of approximately $2,000 whether it provided one in-home therapy visit to a patient or nine visits per Episode. But, if an HHA was to provide a tenth visit during that Episode, it would trigger a bonus payment to the HHA of approximately $2,000 – essentially doubling the HHA's total Medicare reimbursement for the patient Episode.

6.     In response to the industry-wide abuse of the tenth-visit threshold by HHAs, CMS changed the federal reimbursement rules starting in 2008 to remove the ten home therapy visits as the "magic" trigger for "windfall" reimbursements. Instead, CMS implemented smaller, though still significant, bonus payments at the sixth, fourteenth, and twentieth therapy visit thresholds. HHAs, including Gentiva, swiftly adapted their business practices in order to improperly take advantage of the new bonus payment thresholds. Instead of providing ten home therapy visits per patient, as occurred prior to CMS changing the bonus trigger in 2008, miraculously Gentiva started providing six, fourteen and twenty home therapy

visits after the bonus triggers were changed.

7.     To date, and despite the fact that they zealously monitored regulatory action as well as the Company's own internal in-home-visit data, defendants have claimed, in essence, that this phenomenon was merely the result of random chance; defendants claim that once the windfall reimbursement threshold was changed, many of the Company's patients suddenly needed either not quite as much care (around six visits instead of ten) or slightly more care (around fourteen or more visits instead of ten).   In other words, defendants have claimed that by sheer chance, Gentiva's patient Episodes clustered at the lucrative thresholds – including the Company's shift away from the former tenth visit threshold to cluster at the new sixth and fourteenth visit thresholds – starting in the very year the thresholds changed.

8.     During the Relevant Period, with the approval or conscious disregard of the Board and senior officers, Medicare has been illegally and improperly "gamed" through a Company-wide scheme pursuant to which Gentiva's health providers visited patients an artificially excess number of times per Episode specifically in order to trigger the additional payments.   The motivation for this scheme was simple – defendants were able to report drastically inflated financial results for the Company (and purported "organic revenue growth") quarter after

quarter and year after year, and in turn, receive artificially inflated compensation based on those alleged "results."

9. Indeed, defendants' scheme worked because, as discussed herein, prior to the revelation of their illegal scheme, the Company was able to meet or beat consensus analyst earnings estimates for every quarter from the second quarter of 2008 until the first quarter of 2010.

10. Defendants' long-running scheme was finally exposed when the *Wall Street Journal* (the "*WSJ*") published an article on April 27, 2010 entitled "Home Care Yields Medicare Bounty," which revealed that several HHAs – including Gentiva – had, for years, improperly and unethically manipulated the appropriate number of home therapy visits to patients in order to improperly take advantage of Medicare's reimbursement policies. Specifically, the *WSJ* retained Henry Dove ("Professor Dove"), a professor at Yale University's School of Public Health, to analyze the number of Medicare home visits from various HHAs, including Gentiva, based on publicly available Medicare records, and to determine "whether the number of visits coincided with Medicare financial incentives."

11. According to the *WSJ*, the Medicare Payment Advisory Commission ("MedPAC"), the federal agency charged with advising Congress on Medicare payment issues, found that after CMS changed the bonus payment threshold in

- 5 -

2008 from ten therapy visits to six, fourteen, and twenty, the number of patients who received visits in the ten to thirteen range fell considerably on an industry-wide basis. With respect to Gentiva specifically, Professor Dove's analysis revealed that from 2007 to 2008, "*the 10-visit percentage fell 27%*."[1] In an attempt to explain this away, a Gentiva spokesperson was quoted in the *WSJ* as saying that the Company's decisions were purportedly "based on clinical protocols that are driven by what patients need and what their doctors order" and further claimed that "between 2007 and 2008, Gentiva rolled out programs that tended to be more therapy intensive."

12. As could be expected, the public outcry following the revelations in the *WSJ* article was deafening. MedPAC warned that home health "overpayments contribute to the insolvency" of the Medicare trust fund (a troubling development that is already a national problem), as well as premium increases that beneficiaries must pay.

13. Critically, defendants (and especially the Board) cannot plausibly claim that before the *WSJ* exposed the scheme being perpetrated at Gentiva that they were "blamelessly unaware" of the Company's problems. On or around March 1, 2006, MedPAC submitted a report to Congress pursuant to its legislative

---

[1] Emphasis is supplied throughout unless otherwise noted.

mandate to evaluate Medicare payment issues and make specific recommendations.  Among other things, the March 1, 2006 MedPAC report discussed the risk of Medicare abuse triggered by the PPS as implemented in 2000. MedPAC specifically warned that: "*[t]hree reports from the Office of Inspector General indicate some agencies are providing more therapy than is medically necessary*."  This was a glaring "red flag," which should have placed (and indeed, did place) the entire Board on notice of the exact misconduct complained of herein.

14.     Indeed, the Board has much to answer for.  Notably, a majority of the Company's directors at the time this action was initiated had served on the Board since 2006, when the MedPAC report was issued.  Accordingly, a majority of the Company's directors were on notice of the federal government's serious concerns about the abuse of Medicare (and the resulting devastating impact such abuse could have on the Company); yet, they took no action.

15.     The Company-wide, long-running scheme to increase the number of in-home visits to meet Medicare thresholds alleged herein was either expressly or implicitly approved by defendants, including the Board.  Indeed, the scheme perpetrated at Gentiva and detailed herein was widespread, prevalent, and continued for years despite numerous "red flags."  In addition to the damages already caused, the exposure to future harm that the Company now faces is

- 7 -

material.

16.    For instance, violations of the federal False Claims Act (the "FCA") could potentially lead to ***the exclusion of the Company from Medicare and Medicaid programs***.[2]  Because over 80% of the Company's revenues are derived from Medicare, exclusion would destroy Gentiva.

17.    Defendants were well-aware of this material "bet the Company" risk throughout the Relevant Period, and they routinely warned shareholders of the disastrous consequences that exclusion could produce.  For example, in the Company's Annual Report on Form 10-K for fiscal year 2010 filed with the Securities and Exchange Commission (the "SEC") on March 11, 2011, defendants warned that: "[i]f any of our home health or hospice programs fails to comply with the Medicare conditions of participation, that program could be terminated from the Medicare program, thereby adversely affecting our net patient service revenue and profitability."

18.    On May 13, 2010, in an article entitled "Senators Question In-Home Caregivers," the *WSJ* reported that Gentiva was the target of an investigation by

---

[2] Moreover, under the FCA, knowingly presenting or causing to be presented to the government any false of fraudulent claim for payment is a violation of federal law. The U.S. government may recover for a violation of the FCA ***three times*** the amount of the damage the government sustained, in addition to a civil monetary penalty.  It is a violation of the FCA to bill Medicare for a medically-unnecessary visit.

the U.S. Senate Finance Committee (the "Finance Committee").  According to the *WSJ*, the Finance Committee had launched an investigation into the practices of companies that provide in-home therapy visits reimbursed by Medicare to determine "whether the companies deliberately boosted the number of home therapy visits to trigger higher Medicare reimbursements."  The Finance Committee requested information concerning Gentiva's home therapy visits from 2006 through 2009.  On this news, Gentiva shares declined on May 13, 2010 by $2.20 per share to close at $27.55 per share - a drop of 7%.

19.    The next day, on May 14, 2010, defendants caused the Company to issue a press release entitled "Gentiva Health Services Comments on Senate Finance Committee Requests," which unequivocally denied any wrongdoing. Among other things, the press release quoted defendant H. Anthony Strange ("Strange"), the Company's current Chairman, President, and Chief Executive Officer ("CEO"), as stating: "I am proud of the care that our thousands of home healthcare clinicians provide to patients each and every day, as well as the measures that Gentiva takes to ensure its appropriateness."  Notwithstanding their swift, public denial of any wrongdoing (before any meaningful investigation could have occurred), notably, defendants did not provide an explanation as to why, as the *WSJ* had exposed, from 2007 to 2008, "the 10-visit percentage fell 27%."  Nor

did defendants indicate that they would conduct, or cause to be conducted, any independent internal investigation.

20.     On May 26, 2010, the Finance Committee requested supplemental information from the Company relating to Gentiva's "compliance program, policies and procedures, and billing manuals."

21.     Critically, this was not the first time that the Company had come under fire on defendants' watch and under their direction for violating the applicable rules and regulations pertaining to Medicare.  In 2003 and 2004, the Company received subpoenas concerning its treatment on cost reports of employees engaged in sales and marketing efforts, based on allegations that Gentiva had fraudulently billed Medicare for costs not covered by the program.   In June 2011, defendants caused the Company to reach a settlement agreement with the Office of Inspector General ("OIG") and the Department of Justice ("DOJ"). Pursuant to that settlement, the Company was forced to pay the government a total of *$12.5 million*, and the DOJ stated in a press release that its "investigation established that, through its annual submission of cost reports to Medicare for the years 1998 through 2000, Gentiva improperly billed Medicare for salaries and other costs of employees performing sales functions that were designed to increase patient utilization."   Accordingly, defendants' attempts to improperly "game"

Medicare have been going on for years despite the fact that they were well-aware of (and had specifically issued warnings about) the inherent risks and damages such conduct could cause the Company.

22.    On July 13, 2010, defendants caused the Company to issue a press release disclosing that the SEC had also commenced an investigation relating to Gentiva's participation in the Medicare Home Health Prospective Payment System.  Even though the Company was now under investigation by the SEC as well as the Finance Committee, defendants *still* failed to conduct any independent internal investigation.  The July 13, 2010 press release stated, in part:

> The Company separately announced that today it has been informed by the Securities and Exchange Commission that the Commission has commenced an investigation relating to Gentiva's participation in the Medicare Home Health Prospective Payment System (HH PPS).  The Company believes the investigation is similar to the Commission's ongoing investigations and the Senate Finance Committee inquiry previously disclosed by some home health companies.  The Commission requested that the company preserve all documents from January 1, 2000 to the present relating to its participation in the HH PPS and was further advised that a subpoena would be forthcoming in the next few days.  The Company plans to comply with the document request and cooperate with the investigation.

23.    On this news, Gentiva's stock declined by $0.31 per share to close at $21.99 per share on July 14, 2010.

24.    Over the course of the next year, however, at least in part because defendants' illicit Medicare scheme had been exposed publicly and could no longer

continue to be perpetrated, the Company's financial results, and accordingly its stock price, suffered greatly.  For example, on August 1, 2011, after the market closed, defendants revealed that the Company's net income for the second quarter of 2011 had declined by *73%* from the same quarter just one year earlier, and announced substantially reduced guidance as well.  On this news, over the next ten days, the Company's stock price was sliced by nearly *two thirds*, from its opening price of $17.90 per share on August 1, 2011 to just $6.10 per share on August 10, 2011.  The worst was yet to come, however.

26. On October 3, 2011, the Finance Committee issued a report of its investigative findings to date (the "SFC Report"), in which it concluded that Gentiva and other HHAs *intentionally* increased the frequency of home health visits in order to take advantage of the Medicare reimbursement system and boost their reimbursement rates.

26. Specifically, with respect to Gentiva, the Finance Committee noted, among other things, that after the 2008 reimbursement change the number of Gentiva patients who received 10 visits declined by 24%, while the number of patients who received either 14 or 20 visits rose by 21% and 29%, respectively.

27. The SFC Report further revealed that in January 2007, both defendant Strange and the Company's former CEO, defendant Ronald A. Malone

- 12 -

("Malone"), received an internal email in response to the proposed 2008 reimbursement change, which stated that an internal group had been created at Gentiva to determine "*whether revisions to [o]ur therapy protocols are clinically defensible*." Accordingly, by at least January 2007, defendants Strange and Malone were both on notice of the Company's illicit scheme to game the Medicare system.

28.     The Finance Committee also revealed that "[i]nternal documents and e-mails show that Gentiva's management discussed increasing therapy visits and expanding specialty programs to increase Medicare reimbursements" and that an internal analysis presented in September 2007 to defendant Strange "found that 'increasing therapy visits by an average of 2 visits per episode will increase revenue by approximately $350 to $550 per episode. Adding therapy services (6 visits) to patients with high functional needs will increase revenue by about $700 per episode.'"

29.     The SFC Report stated that Gentiva's practices in this regard and those of other HHAs, at best, "represent abuses" of the Medicare program. "At worst," it said, "they may be examples of for-profit companies defrauding" the program at federal taxpayers' expense. On this news, the Company's already-decimated stock price declined by nearly 33%, from $5.45 per share to close at

$3.68 per share.

30.     The media, predictably, was not kind to Gentiva in the wake of the SFC Report.  For example, on October 4, 2011, the *WSJ* issued an article entitled "Home-Health Firms Blasted."  The article revealed the results of the investigation by the Finance Committee, which the *WSJ* article stated, in part:

> At Gentiva, the report said, a spreadsheet analyzing Medicare's 2008 reimbursement changes showed that the company would earn $11 million more from the federal program if "therapy visits provided increased 2 to 4 visits to reach 6- and 14-visit plateaus."

> Another internal analysis of the coming reimbursement changes emailed to Gentiva Chief Executive Tony Strange on Sept. 7, 2007 stated that "increasing therapy visits by an average of 2 visits" per patient "will increase revenue by approximately $350 to $550 per episode" of care.

31.     And, incredibly, even in the wake of the Finance Committee's findings and the media backlash, defendants, including the Board, have continued to publicly proclaim their "innocence."  Indeed, in the Company's most recent Quarterly Report on Form 10-Q filed with the SEC on November 9, 2011, defendants stated: "We maintain our belief that we have provided and are providing the highest quality of care and have received and continue to receive payment within the standards set forth by the reimbursement system established by CMS."

32.     Critically, even after the results of the SFC Report were revealed, the

- 14 -

Board *still* has failed to conduct any independent internal investigation, even though it was, and is, duty-bound under Delaware law to properly inform itself regarding the Company's problems when put on notice of them.  The Board has, at literally every turn, refused to do so.  The Board's failure to properly inform itself of the veracity of the allegations underlying the Finance Committee and SEC investigations, and the SFC Report, is a separate and distinct breach of fiduciary duty and excuses any demand on the Board.

33.     Despite the release of its October 3, 2011 report, the Finance Committee investigation remains ongoing, as does the SEC investigation, and the Company faces potentially massive liability in connection with these inquiries.

34.     The true facts, which were known by defendants, but they failed to disclose during the Relevant Period, were as follows:

> a. Defendants improperly caused or permitted the Company to increase the number of in-home therapy visits to patients for the improper purpose of triggering higher reimbursement rates under the Medicare system, which ultimately resulted in the Company becoming the target of investigations by the Committee and the SEC; and

b. Gentiva's purported strong revenue growth was not due solely to "organic growth" from real end-market demand as portrayed by defendants, but rather was at least in part due to the manipulation of the number of in-home therapy visits Gentiva patients received in order to reach the threshold reimbursement levels set by Medicare.

35.   The price of the Company's stock has never recovered from these events, and currently trades for under $8 per share – less than one-third of its Relevant Period high.

36.   Accordingly, as a result of defendants' breaches of fiduciary duty and other misconduct, the Company has been damaged.

## JURISDICTION AND VENUE

37.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

38.   Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary

participation in the wrongful acts detailed herein, occurred in this District.  One or more of the defendants either resides in or maintains executive offices in this District, and defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## THE PARTIES

39.     Plaintiff Stevens is a current shareholder of Gentiva and has continuously held Gentiva stock since April 2010.

40.     Plaintiff Cuzzola is a current shareholder of Gentiva and has continuously held Gentiva stock since December 2004.

41.     Nominal defendant Gentiva is a Delaware corporation, with its principal executive offices at 3350 Riverwood Parkway, Suite 1400, Atlanta, Georgia 30339.  According to its public filings, Gentiva provides home health services and hospice care in the southeast United States.

42.     Defendant Strange has served as President of the Company since November 2007.  In addition, Strange has served as a director of the Company and as its CEO since January 2009.  Moreover, Strange has served as Chairman of the Board since May 2011.  Defendant Strange first joined the Company in 2006 and served as Executive Vice President from 2006 until November 2007.  From

November 2007 until December 2008, Strange served as Gentiva's Chief Operating Officer ("COO").

43.     Defendant Malone has served as a director of the Company since 2002.   In addition, defendant Malone has served as a member of the Board's Clinical Quality Committee (the "Quality Committee") during the Relevant Period. Further, defendant Malone previously served as Chairman of the Board from 2002 until May 2011 and as the Company's CEO from 2002 until January 1, 2009, and is now the Executive Chairman of the Board.   Defendant Malone has also served as a professional paid consultant to the Board since January 2011 and receives $15,000 per month (or $180,000 per year) in compensation as a result.

44.     Defendant John R. Potapchuk ("Potapchuk") served as the Company's Executive Vice President, Chief Financial Officer ("CFO") and Treasurer from 2002 until May 13, 2010.   From May 13, 2010 until May 2011, defendant Potapchuk served as a "Special Advisor" to the Company.

45.     Defendant Robert S. Forman, Jr. ("Forman") has served as a director of the Company since September 2009.   In addition, defendant Forman has served as a member of the Board's Audit Committee (the "Audit Committee") since September 2009.   Further, defendant Forman has served as a member of the Quality Committee during the Relevant Period.

- 18 -

46.     Defendant Victor F. Ganzi ("Ganzi") has served as a director of the Company since 1999 and as Lead Director of the Board since May 2009.   In addition, defendant Ganzi has served as a member of the Audit Committee since 1999 and served as the Chairman of the Audit Committee from November 1999 until May 2009.  Further, defendant Ganzi has served as a member of the Board's Compensation, Corporate Governance and Nominating Committee (the "Compensation Committee") since May 2008.

47.     Defendant Philip R. Lochner, Jr. ("Lochner") has served as a director of the Company since 2009.  In addition, defendant Lochner has served as a member of the Compensation Committee during the Relevant Period.  Further, defendant Lochner has served as a member of the Quality Committee during the Relevant Period.

48.     Defendant Stuart Olsten ("Olsten") has served as a director of the Company since September 1999.  In addition, defendant Olsten has served as a member of the Audit Committee during the Relevant Period.  Further, defendant Olsten has served as a member of the Compensation Committee during the Relevant Period.  Lastly, defendant Olsten served as a member of the Quality Committee during the Relevant Period.

49.     Defendant Sheldon M. Retchin ("Retchin") has served as a director of

the Company since 2009.  In addition, defendant Retchin has served as a member of the Quality Committee during the Relevant Period.

50.     Defendant Raymond S. Troubh ("Troubh") has served as a director of the Company since 1999.  In addition, defendant Troubh has served as a member of the Audit Committee during the Relevant Period.  Further, defendant Troubh has served as a member of the Compensation Committee during the Relevant Period.

51.     Defendant Rodney D. Windley ("Windley") has served as a director of the Company since 2006.  In addition, defendant Windley has served as a member of the Quality Committee during the Relevant Period.  Further, defendant Windley previously served as Chairman and CEO of The Healthfield Group, Inc. ("Healthfield"), which the Company acquired in February 2006.   Finally, defendant Windley is a manager and has a 100% beneficial interest in RDW Ventures, LLC ("RDW"), which is an entity that the Company has leased an aircraft from and in connection therewith paid RDW almost *$600,000* in fiscal year 2010.

52.     Collectively, defendants Strange, Malone, Potapchuk, Forman, Ganzi, Lochner, Olsten, Retchin, Troubh, and Windley shall be referred to herein as "Defendants."

53.     Collectively, defendants Forman, Ganzi, Olsten and Troubh shall be referred to as the "Audit Committee Defendants."

54.     Collectively, defendants Ganzi, Lochner, Olsten, and Troubh shall be referred to as the "Compensation Committee Defendants."

55.     Collectively, defendants Forman, Lochner, Malone, Olsten, Retchin, and Windley shall be referred to as the "Quality Committee Defendants."

## DEFENDANTS' DUTIES

56.     By reason of their positions as officers, directors, and/or fiduciaries of Gentiva and because of their ability to control the business and corporate affairs of Gentiva, Defendants owed Gentiva and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Gentiva in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Gentiva and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Gentiva and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

57.     Defendants, because of their positions of control and authority as directors and/or officers of Gentiva, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Gentiva, each of the Defendants had knowledge of material non-public information regarding the Company.

58.     To discharge their duties, the officers and directors of Gentiva were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Gentiva were required to, among other things:

    a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

59.     According to the Company's Code of Business Conduct and Ethics (the "Code of Conduct"), which expressly applies to all Defendants, "[i]t is the

Company's policy that its business be conducted in accordance with all applicable laws and regulations and in a manner that will always reflect a high standard of ethics.  The Company is engaged in a highly regulated business; therefore, the laws and regulations applicable to the Company are far-reaching, complex and include laws, regulations and rules governing healthcare programs."

60.     Additionally, the Code of Conduct states that "[c]ompliance with the law does not comprise our entire ethical responsibility; rather, it is a minimum, absolutely essential conduction for performance of our duties."  Finally, the Code of Conduct specifically prohibits Defendants from engaging in any violations of the FCA.

61.     Additionally, according to the Company's Corporate Governance Guidelines (the "Governance Guidelines"), the Board is specifically required for "overseeing compliance with applicable laws and regulations."

62.     Pursuant to the Quality Committee's Charter, the Quality Committee is supposed to provide oversight to the measuring, disseminating, and improving of clinical practices, with the goals of sustaining leadership in, and setting best practices for, the home health industry.

63.     The specific duties of the Quality Committee include, among other things, monitoring the Company's performance on established internal and

external benchmarking regarding clinical performance and outcomes, facilitating the development of industry best practices based on internal and external data comparisons, and fostering enhanced awareness of the Company's clinical performance by the Board.

64.     Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

a. Review the annual and quarterly financial statements with management;

b. Review with management the extent to which changes or improvements in financial or accounting practices have been implemented;

c. Oversee the Company's compliance with legal and regulatory requirements;

d. Review with the Company's General Counsel, on not less than a semi-annual basis, all material litigation and other significant legal matters that may have a material impact on the Company's financial statements and compliance policies and programs;

e. Discuss with management the guidelines and policies with respect to the Company's financial risk assessment and risk management policies; and

f. Review the adequacy and effectiveness of the accounting and financial controls on the Company, and elicit any recommendations for the improvement of such internal control procedures or particular areas where new or more detailed controls or procedures would be desirable.

65.     Pursuant to the Company's Compensation Committee Charter, the

members of the Compensation Committee are required, *inter alia*, to:

     a.  Determine the compensation of the Company's CEO, including awards of stock options, bonuses and other incentives, and discuss its determination with the Board in executive session;

     b.  In determining compensation of the CEO, consider the Company's performance and relative shareholder return; and

     c.  Review and approve goals and objectives relevant to the compensation of the Company's other executive officers, evaluate such executive officers' performance in light of those goals and objectives and determine such executive officers' compensation based on this evaluation.

## SUBSTANTIVE ALLEGATIONS

**A.**     <u>**The Company's Background And Its Reliance On Medicare**</u>

66.    According to its public filings, Gentiva's operations include its Home Health segment and its Hospice segment.  Throughout the Relevant Period, the Home Health Segment was the Company's largest segment.  In 2009, nearly 94% of the Company's revenues came from this segment.  Gentiva's Home Health segment comprises direct home nursing and therapy services operations, including specialty programs.

67.    Gentiva derives the majority of its revenues from reimbursements by Medicare.  For example, in 2008 and 2009, 57% and 74% of the Company's revenues, respectively, came from Medicare.  Medicare reimbursements to HHAs, like Gentiva, are based in part on the number of at-home therapy visits each patient

receives.  The Company receives a flat fee for a certain number of patient visits and then is entitled to receive an additional fee if the number of patient visits meets a specified threshold.

68.    From 2000 through 2007, Medicare paid home health providers approximately $2,000 for up to nine home therapy visits to a patient.  Thereafter, Medicare paid the providers an additional fee of approximately $2,000 if the number of therapy visits to that patient reached at least ten visits.  The system changed on January 1, 2008, and Medicare reduced the amount of the additional fee, but still set threshold levels of six, fourteen and twenty visits whereby a home health provider could receive an extra fee if the number of patient visits reached one of the preset target levels.

**B.    Establishment Of The Prospective Payment System And The Lucrative "Tenth-Visit Threshold"**

69.    The Medicare reimbursement system that has been taken advantage of by Defendants traces back to the Balanced Budget Act of 1997 (the "BBA").  The BBA required the implementation of a PPS for home health services.  According to the SFC Report, "[p]rior to the establishment of PPS, Medicare paid on a cost-based reimbursement system, in which Medicare paid separately for items and services furnished by each home health agency."  On July 3, 2000, the CMS (then known as the Health Care Financing Administration) published final rules

establishing the PPS, which took effect on October 1, 2000 and drastically changed Medicare reimbursement methodology.

70.   In contrast to the cost-based reimbursement system, the PPS reimburses home health care providers according to a "case-mix system," which uses a predetermined, multi-factor payment schedule.  In order to determine the amount Medicare will reimburse for home health care services under the PPS, an HHA such as Gentiva must categorize each patient within three different dimensions: (1) clinical severity; (2) functional severity; and (3) service utilization. Between 2000 and 2007, there were four clinical severity levels, five functional severity levels, and four services utilization severity levels.  The combination of a patient's severity level within each dimension provides that patient's "case-mix group," also known as a Home Health Resource Group ("HHRG").  Before the PPS changed in 2008, there were 80 HHRGs, reflecting the 80 possible combinations of severity levels across the three dimensions.  CMS expanded the number of HHRGs to 153 starting in 2008.

71.   As the SFC Report explains, a patient's HHRG is the starting point for calculating an HHA's Medicare reimbursement:

> In creating the PPS, the Centers for Medicare and Medicaid Services (CMS) established a basic unit of payment for home health services in which home health agencies would receive payment for a 60-day episode of care. This single payment was intended to cover the skilled

care needs of individuals who were restricted to their homes for a 60-day period. These services included nursing care; physical, occupational, and speech therapy; medical social work; home health aide services; and certain routine medical supplies.

CMS also developed a patient classification system to adjust payments, also known as a 'case-mix adjustment,' in the home health PPS based on each patient's health characteristics and use of services. The patient classification system originally consisted of 80 Home Health Resource Groups (HHRGs). Home health agencies would determine each patient's health characteristics using the Outcome and Assessment Information Set (OASIS) and each patient would be assigned to an HHRG based on that assessment.…

\* \* \*

These characteristics are combined to determine each patient's HHRG, which ultimately dictates the reimbursement payment to each home health agency.…

72.     Although a patient's HHRG is the foundation for calculating a Medicare reimbursement, in practice, the reimbursement was substantially determined by the number of home therapy visits provided to a patient within a single sixty-day Episode. Between 2000 and 2007, HHAs typically received a fee of about $2,000 for up to nine home therapy visits per Episode. Whether the HHA provided one visit or nine visits, Medicare would pay the HHA virtually the same total amount: approximately $2,000. However, the PPS provided HHAs with a significant "bonus" – essentially doubling the total reimbursement – if a patient received at least 10 therapy visits within that Episode. The SFC Report, in understated language, describes this bonus as "substantial," and observes that

"providing 10 visits as opposed to 9 visits increased reimbursement on average 97.5 percent (over $2000) in 2007."

73.    The below chart is a reproduction of Figure 2 from the SFC Report. Figure 2 shows, according to CMS data, the average payment per Episode that HHAs received in 2007 and the percentage increase of the average Medicare reimbursement payment as the number of visits per Episode increases:

**Figure 2: Average Home Health Episode Payment By Number Of Therapy Visits, 2007**

| Number of Therapy Visits | Payment Amount | Percentage Increase | Number of Therapy Visits | Payment Amount | Percentage Increase |
|---|---|---|---|---|---|
| 1 | $1,600.19 | | 16 | $4,431.62 | 0.43% |
| 2 | $1,728.28 | 8.00% | 17 | $4,420.06 | -0.26% |
| 3 | $1,828.10 | 5.78% | 18 | $4,475.52 | 1.25% |
| 4 | $1,925.85 | 5.35% | 19 | $4,495.57 | 0.45% |
| 5 | $2,124.98 | 10.34% | 20 | $4,548.37 | 1.17% |
| 6 | $2,148.46 | 1.10% | 21 | $4,514.26 | -0.75% |
| 7 | $2,162.31 | 0.64% | 22 | $4,546.42 | 0.71% |
| 8 | $2,188.76 | 1.22% | 23 | $4,540.15 | -0.14% |
| 9 | $2,198.56 | 0.45% | 24 | $4,666.77 | 2.79% |
| 10 | $4,342.66 | 97.52% | 25 | $4,572.56 | -2.02% |
| 11 | $4,390.12 | 1.09% | 26 | $4,610.77 | 0.84% |
| 12 | $4,604.31 | 4.88% | 27 | $4,642.40 | 0.69% |
| 13 | $4,445.15 | -3.46% | 28 | $4,796.61 | 2.30% |
| 14 | $4,453.79 | 0.19% | 29 | $4,796.61 | 1.00% |
| 15 | $4,412.86 | -0.92% | 30 | $4,720.55 | -1.59% |

74.    Thus, prior to 2008, a tenth visit was the "magic visit" – one that was

highly profitable to Gentiva (as it was for all other HHAs), because it would essentially double the Company's Medicare reimbursements for a given Episode. At the same time, the incremental costs to the Company for providing a tenth visit were very low in comparison to the "bonus."

### C. CMS Discards The Ten-Visit Therapy Threshold In An Unsuccessful Effort To Curb Blatant Abuse By Gentiva And Other HHAs

75.     When CMS published the final rules implementing the PPS in 2000, it expressly recognized that the tenth-visit threshold for the bonus was "susceptible to manipulation."  CMS also stated that it was "concerned that counting visits rather than hours to satisfy the therapy threshold in the case-mix groupings could become a source of potential abuse."

76.     However, CMS indicated optimism that HHAs, such as Gentiva, would self-monitor to minimize abuse of the therapy visit threshold.  In response to a rule-making comment that monitoring is needed to prevent payment incentives from distorting functional assessment measurements, CMS responded that "[w]e expect that agencies will measure functional status as accurately as possible, consistent with incentives for efficiency in the prospective payment system." These statements, published in the Federal Register, served as a direct warning to the Board to ensure that the tenth-visit threshold was not manipulated or abused,

and to design and implement a system of internal controls that would be sufficient to prevent the same.

77.    Notably, when CMS adopted the tenth-visit threshold, rampant manipulation and abuse seemed as though it were only a remote possibility.  The SFC Report explains that CMS adopted the tenth-visit threshold in order to reflect the level of care needed by a relatively small number of patients with "significant therapy needs":

> CMS implemented [the tenth-visit threshold] in part to discourage 'stinting,' a term used within the industry to describe agencies rendering the lowest level of service necessary to collect Medicare payment.  CMS officials determined *8 hours of combined physical, speech, or occupational therapy over a 60-day episode would provide a suitable level of care for patients with significant therapy needs*; however, a study by Abt Associates commissioned by *CMS indicated few patients received that level of care prior to the implementation of PPS*.  CMS divided the 8 hours into 10 therapy sessions, lasting 48 minutes each, to determine the visit number threshold.

78.    Indeed, when publishing in the Federal Register its final rules implementing the PPS in 2000, CMS expressed its "intent to have the [tenth-visit] therapy threshold, as applied within a 60-day, target patients with significant therapy needs."  CMS further explained, "The rationale for recognizing a therapy utilization factor is to ensure that agencies will be adequately compensated for delivering this high-cost service, thus preserving access for patients with therapy needs."

79.    By designing the bonus payment to be available only for treatment of the very few patients with "significant therapy needs," CMS also intended to mitigate abuse of the tenth-visit therapy threshold.  In its comments accompanying the final rules implementing the PPS, CMS explained: "If we adopted a lower therapy threshold or a graduated threshold…we believe the result would be an increase in the incentive to maximize payments by manipulating the delivery of therapy."

80.    This explanation, as well as the CMS's explicit intent to preserve care for patients with "significant therapy needs," was known or should have been known by Defendants, including the Board, who accordingly were duty-bound to and should have taken reasonable measures to ensure that only patients with "significant therapy needs" actually received ten or more therapy visits.

81.    Despite the limited role CMS intended for the tenth-visit bonus, CMS's stated concerns regarding "manipulation" and "abuse" of the tenth-visit threshold came to fruition (and may have been surpassed by a long shot).  On or around March 1, 2006, MedPAC submitted a report to Congress pursuant to its legislative mandate to evaluate Medicare payment issues and make specific recommendations.  Among other things, MedPAC's report expressly discussed the risk of Medicare abuse triggered by the prospective payment system as

implemented in 2000.  The MedPAC's report stated, in pertinent part:

> [T]hree reports from the Office of Inspector General indicate some agencies are providing more therapy than is medically necessary (OIG 2005a, 2005b, 2005c).  The OIG selected an agency each from Florida, California, and Connecticut for a review of claims that just met the 10-visit threshold for higher payments based on therapy service provision.  At two agencies, the therapy provided failed a record review for medical necessity of services (64 out of 74 claims failed in one case; 19 out of 40 claims failed in the other). In the third case, all of the 100 claims sampled met the test for medical necessity. The third case proves that overuse of therapy is not universal; however, the first two cases suggest that overuse of therapy may be an issue.

> Overuse of therapy is consistent with the incentives of the payment system. Episodes with 10 or more visits for physical therapy, occupational therapy, or speech pathology (therapy) satisfy the 10-visit threshold for increased payments under the PPS.  Medicare pays about $2,500 more for an episode that meets the therapy threshold than for a similar episode with nine or fewer therapy visits.  We see relatively more episodes that just meet the therapy threshold and fewer episodes with eight or nine therapy visits (Wardwell and Thompson 2005).

> The OIG reports suggest that rethinking the therapy threshold could be a good place to start restructuring this system.

82.    Critically, Defendants should have heeded MedPAC's prior warning given the core importance of Medicare to the Company's revenues.  For instance, as discussed above, in 2008 and 2009, 57% and 74% of the Company's revenues, respectively, were derived from Medicare.

83.    MedPAC's March 2006 warnings, like the earlier warnings issued by

CMS, went unnoticed, and HHAs including Gentiva continued to take advantage of the tenth-visit therapy threshold.   Between 2002 and 2007, the number of Episodes in which patients received between 10 and 13 visits increased by 90%, at an annual rate of 13.8%.   Meanwhile, the percentage of Episodes with visits numbering just above and below that range remained relatively the same.   The SFC Report explains:

> Not surprisingly, the home health episodes that utilized therapy services, also referred to as therapy episodes, demonstrated a concentrated number of visits at or just above thresholds where payments were much greater. The Medicare Payment Advisory Commission (MedPAC) found that *episodes with the number of therapy visits between 10 and 13 increased by about 90 percent between 2002 and 2007 at an annual rate of 13.8 percent. However, the percentage of episodes just above and below the 10 to 13 therapy visit range remained relatively unchanged during the same period.* CMS noted similar results, finding the threshold system 'might have distorted service delivery patterns.' *CMS found that the 10-to 13-visit range had the highest concentration of therapy episodes among cases that utilized home therapy.* Of all episodes at or above the 10-visit threshold, half were concentrated in the 10 to 13 range.

84.    On August 29, 2007, the CMS released final rules revising the PPS that took effect on January 1, 2008.  The SFC Report explains that "CMS retained a tiered therapy threshold system, despite evidence that a threshold system might be gamed or 'padded' to increase reimbursement to home health agencies."

85.    As part of the revised PPS, beginning in January 2008, CMS eliminated the substantial bonus payment at the tenth episodic visit.   Instead,

Medicare began to provide smaller – although still significant – bonus payments at the sixth, fourteenth, and twentieth therapy visit thresholds.  Medicare also began to provide nominal bonus payments at the seventh, tenth, eleventh, sixteenth, and eighteenth therapy visit thresholds.

86.    The below reproduction of Figure 4 from the SFC Report shows, according to CMS data, the average payment per Episode that HHAs received in 2008 and the percentage increase of the average Medicare reimbursement payment as the number of visits per Episode increases:

**Figure 4: Average Home Health Episode Payment By Number Of Therapy Visits, 2008**

| Number of Therapy Visits | Payment Amount | Percentage Increase | Number of Therapy Visits | Payment Amount | Percentage Increase |
|---|---|---|---|---|---|
| 1 | $1,544.03 | | 16 | $5,010.47 | 6.48% |
| 2 | $1,639.59 | 6.19% | 17 | $4,947.58 | -1.26% |
| 3 | $1,742.85 | 6.30% | 18 | $5,275.00 | 6.62% |
| 4 | $1,803.85 | 3.50% | 19 | $5,276.52 | 0.03% |
| 5 | $1,925.24 | 6.73% | 20 | $6,809.22 | 29.05% |
| 6 | $2,546.26 | 32.26% | 21 | $6,834.21 | 0.37% |
| 7 | $3,012.44 | 18.31% | 22 | $6,805.92 | -0.41% |
| 8 | $3,016.42 | 0.13% | 23 | $6,841.38 | 0.52% |
| 9 | $3,023.28 | 0.23% | 24 | $6,888.63 | 0.69% |
| 10 | $3,532.60 | 16.85% | 25 | $6,897.02 | 0.12% |
| 11 | $3,930.55 | 11.27% | 26 | $6,909.06 | 0.17% |
| 12 | $4,076.06 | 3.70% | 27 | $6,926.91 | 0.26% |
| 13 | $3,954.84 | -2.97% | 28 | $6,994.30 | 0.97% |
| 14 | $4,788.38 | 21.08% | 29 | $6,991.55 | -0.04% |
| 15 | $4,705.76 | -1.73% | 30 | $6,926.49 | -0.93% |

87.     Discussing these changes to the reimbursement rules in its April 27, 2010 article, the *WSJ* explained:

> Medicare changed its reimbursement rules in January 2008 in an attempt to blunt the incentive for home health-care visits it created. It eliminated the $2,200 bonus payment at 10 visits and now pays an extra fee of a couple of hundred dollars at six, 14 and 20 therapy visits. "What we felt we could do is try to create some better incentives in the system for providing the level of service that beneficiaries actually needed," says Mr. Wilson from Medicare.

88.     In its March 2008 report to Congress, MedPAC discussed the January 2008 changes to Medicare, and explained how these changes "will lead to a more appropriate distribution of payments" and help address the "significant financial incentive" presented by the additional fixed payment at the tenth visit.  MedPAC also warned, however, that "higher payments for therapy-intensive cases, coupled with the lower threshold for additional payment, suggests that significant incentives for additional therapy visits will remain, if not expand, under the new system."

89.     MedPAC's March 2008 report stated in pertinent part:

> Medicare will implement significant refinements to the home health PPS in 2008.  The proposed changes are designed to make payments under the home health PPS more accurate.  The home health benefit has changed significantly since the advent of PPS, but the payment system's resource groups and relative weights are based on data from 1997 and 1998. The changes include several major revisions. The new payment system:

- Revises and expands the patient classification system (home health resource groups (HHRGs)).   CMS replaces the system of 80 HHRGs with a new system of 153 HHRGs.  The new system bases payments on therapy use and an episode's timing in a sequence of consecutive episodes. …

- Replaces the 10-visit therapy threshold.   The new system eliminates the current threshold, which increases payments for episodes that have 10 or more therapy visits and will make gradual payment increases with more therapy visits. ***The HHRG–153 splits the range of therapy visits from 0 to 20 visits into nine thresholds and provides smaller increases among the thresholds.***

* * *

***The changes for therapy payments under the HHRG–153 will lead to a more appropriate distribution of payments***.  Under the previous system, Medicare made fixed additional payments for episodes that included 10 or more therapy visits.  As the number of therapy visits varies significantly among episodes, a single threshold did not capture the incremental costs of therapy in many episodes.  ***Also, this payment "notch" created a significant financial incentive for agencies to provide 10 visits, even if the beneficiary's condition warranted more or less therapy.***  The new system implements a more gradual payment increase by dividing the range of therapy visits between 0 and 20 visits into 9 separate payment thresholds.  ***These new thresholds redistribute funds from the episodes that are most profitable under the previous system, those with 10–13 therapy visits, to those that were less profitable under the original single-therapy threshold.***

* * *

The new refinements modestly improve the home health PPS's accuracy, but additional work is needed to improve the accuracy of the system.  On average, payments substantially exceed costs for most services, and significant variation exists within resource groups in the new system.

- 37 -

> *Therapy services have become a major driver of episode volume and payment growth in the PPS. The HHRG–153 will reduce the payment distortions associated with a single threshold, so payment increases for additional therapy visits will now be more gradual.* However, it will not address the disparity in payment-to-cost ratios between episodes that receive little or no therapy and episodes that receive significant therapy. Even under the new HHRG–153 system, our modeling indicates that episodes with little or no therapy will be less profitable than those with 6 or more therapy visits. Although the increase is more gradual under the new system, it begins increasing payment for therapy at 6 visits compared with 10 for the current system. *The higher payments for therapy-intensive cases, coupled with the lower threshold for additional payment, suggests that significant incentives for additional therapy visits will remain, if not expand, under the new system.* Addressing the disparity in financial margins between therapy and nontherapy patients will make these two classes of patients equally attractive to providers.

90.   An industry-wide assessment of therapy visits provided by HHAs in 2008 leaves no doubt that HHAs have been systematically gaming Medicare.  In 2008, HHAs (including Gentiva, on Defendants' watch and under their direction) adjusted their operations with astonishing speed in order to take advantage of the new, lucrative therapy visit thresholds.  The SFC Report detailed this swift and substantial shift in behavior:

> *Home health agencies rapidly altered their treatment patterns to match the new system, producing what MedPAC called 'the swiftest one-year change in therapy utilization since PPS was implemented.'* Therapy visits furnished by home health agencies shifted from the original 10-visit threshold to the new 6, 14, and 20 visits.  According to MedPAC, 'payment for episodes with 6 to 9 visits increased by 30 percent, and the share of these episodes increased from 8.6 percent to 11.6 percent. Payment for episodes with 14 or more therapy visits

- 38 -

increased by 26 percent, and the share of these episodes increased from 12 percent to 14.5 percent.' In addition, the number of episodes at the 10 to 13 therapy visit range dropped approximately 28 percent.

91.    The repeated statements by the CMS and other government entities demonstrate that the federal government never intended for the tenth therapy visit threshold (or later the sixth, fourteenth, and twentieth visit thresholds) to drive the number of home therapy visits HHAs (such as Gentiva) provided to their patients. Rather, governmental agencies repeatedly expressed concerns about the potential for manipulation and abuse.  These statements (reinforced by CMS's efforts to revise the PPS by eliminating the tenth-visit threshold and stagger bonus payments over several thresholds) placed Defendants on unequivocal notice that the visit thresholds should not influence the number of therapy visits the Company provided to its patients, and that Defendants needed to design and implement internal controls sufficient to prevent the manipulation of the number of therapy visits provided to patients to trigger bonus payments.

### D.    The Finance Committee Finds A "Behavioral Shift" At Gentiva Consistent With "Gaming" Of Medicare

92.    In October 2011, in connection with its investigation, the Finance Committee released the detailed SFC Report examining the home health therapy practices of the four largest publicly traded HHAs, including Gentiva, for indications that these companies were deliberately taking advantage of the

Case 1:11-cv-03429-SCJ   Document 20   Filed 03/05/12   Page 40 of 90

Medicare therapy payment system.

93.     Consistent with the statistical analysis performed by Professor Dove and published by the *WSJ* in April 2010, the SFC Report identified and described distinct trends at Gentiva which strongly indicated that the Company's home health practices were altered in connection with the new lucrative visit thresholds established by CMS for the start of 2008. These trends should have been obvious – if not well known – to Defendants, including the Board, who took no meaningful action whatsoever to address the rampant scheme to "game" Medicare being perpetrated at the Company.

94.     According to the SFC Report, the change in the number of visits Gentiva provided to its patients between 2007 and 2008 firmly indicates that the Company was "responsive" to the CMS's changes to the PPS:

> As Figure 12 indicates, in 2007, 7.7 percent of Gentiva's therapy episodes received 10 visits while 3.6 percent of the therapy episodes received 9 visits. In 2008, the number of therapy episodes that received 10 visits dropped to 5.8 percent.
>
> Also from 2007 to 2008, the number of therapy episodes receiving 6 visits dropped from 6.5 percent to 6.1 percent. However, the percentage of therapy utilization in the 6-visit through 9-visit range increased, from 18.9 percent in 2007 to 22.1 percent in 2008. The number of therapy episodes receiving 14 visits increased from 4.0 percent to 4.8 percent. And the number of therapy episodes receiving 20 visits increased from 1.6 percent to 2.1 percent.

95.     Notably, the SFC Report observes a decrease in the percentage of

- 40 -

Gentiva patients who received 10 therapy visits per episode between 2007 and 2008, and not coincidentally, a marked increase in patients receiving 6, 14, and 20 therapy visits from Gentiva employees.

96.    The SFC Report additionally revealed that in January 2007, both defendants Strange and Malone received an internal email in response to the proposed 2008 reimbursement change, which stated that an internal group had been created at the Company to determine "*whether revisions to [o]ur therapy protocols are clinically defensible*."    Accordingly, by at least January 2007, defendants Strange and Malone were on notice of the Company's illicit scheme to game the Medicare system.

97.    Moreover, the statistics cited in the SFC Report were readily available to, if not known by, Defendants during the Relevant Period and would have waived the red flag in their face that the number of therapy visits the Company's employees were providing patients was being improperly manipulated to trigger bonus payments under the PPS.  This manipulation represented a serious problem, as it represented potential systematic violations of *federal law* that required immediate attention.

98.    Critically, notwithstanding the statistical analyses published by the *WSJ* in 2010 and in the SFC Report in 2011, Defendants cannot credibly claim that

they were unaware of the potential impact the proposed 2008 CMS payment changes would have on the Company.  For instance, according to the SFC Report, Defendants analyzed those changes and found that the Company would earn an additional $11 million from Medicare if "[t]herapy visits provided increased 2 to 4 visits to reach 6 and 14 visit plateaus."  In this regard, the SFC Report stated:

> Internal documents and e-mails show that Gentiva's management discussed increasing therapy visits and expanding specialty programs to increase Medicare reimbursements as a result of the proposed 2008 CMS payment changes.

> Vice President and Chief Clinical Executive Susan Sender wrote in a January 5, 2007 e-mail regarding the CMS payment changes that there was "an internal group . . . crunching utilization and outcomes data to determine whether revisions to our therapy protocols are clinically defensible."

> According to a Gentiva Excel spreadsheet analyzing the proposed 2008 CMS payment changes, the company would earn an additional $11 million from Medicare if "[t]herapy visits provided increased 2 to 4 visits to reach 6 and 14 visit plateaus."

99.    More egregiously, as the SFC Report shows, Defendants actually created and implemented "a competitive ranking system for their management that served to drive therapy visit patters toward the more profitable thresholds." Further, the SFC Report found that "[t]hrough the ranking system, known internally as the key Indicator Report (KIR), Gentiva administrators assigned team names to each reason of operation, such as the Mid-Atlantic 'Spider Monkeys' and

the Carolina 'Killer Bees.'   Teams were then ranked based on a list of 21 individual, weighted metrics primarily designed to maximize profits."

100.   The SFC Report detailed this "ranking scheme" at Gentiva as follows:

A February 16, 2009 e-mail noted that the company planned to eliminate one metric, visits per episode over the last 4 months, from the ranking system because it ''runs counter to our initiative to increase [physical therapy.]" The company later indicated that this metric was not eliminated from the KIR reports.

The highest-ranking teams received encouraging company-wide e-mails such as ''The Killer Bees ... have a taste for victory, served best with a side of Spider Monkey . . ." and ''The race is getting closer for #1 . . . I keep hearing the south will rise again?"55 First place teams also received a monetary bonus during an annual company meeting. In 2007, KIR bonuses totaled $161,811.

In January 2010, Gentiva administrators added two new KIR metrics that would increase a region's rank based on the percentage of therapy visits that fell in the most profitable therapy visit range, between 7 and 20 sessions.

There is also evidence of a direct push toward therapy thresholds in Gentiva's internal educational materials. A presentation titled ''PPS Refinements" noted ''About 12% of Gentiva's episodes have LUPA adjustments, less than five visits in the episode." The document stated that it is ''Interesting how many are at 5, could we have done one more visit??"

*An internal analysis presented to CEO Tony Strange in a September 7, 2007 e-mail found that ''increasing therapy visits by an average of 2 visits per episode will increase revenue by approximately $350 to $550 per episode. Adding therapy services (6 visits) to patients with high functional needs will increase revenue by about $700 per episode."*

An October 2007 presentation showed that a Gentiva employee was tasked to ''Build the case to substantiate increased therapy, including PT, OT, and ST."

In a September 29, 2008 e-mail, Area Vice President for Financial Operations Pete Cavanaugh wrote, ''I'd like to know what overall impact we'll get if we push for an increase in therapy."

In the same e-mail string, Area Vice President of Finance John N. Norlander wrote "Andrew can work with the PPS Files to see if we move 1% of <7 visits and see the last 6 months impact by Region— Net Revenue, Gross Margin and EBITDA."

Senior Vice President and Chief Clinical Officer Dr. Charlotte Weaver wrote in a January 7, 2009 e-mail that "operations did a . . . management assignment" which "addressed getting more therapy visits in an episode of care."

***In a May 3, 2010 letter to CEO Tony Strange, one departing physical therapist expressed disappointment with the direction of Gentiva.*** "***I see the push to treat by metrics not by what the patients need,*** " *the employee wrote.* "***Treating by numbers is . . . making the clinicians feel their professional judgment is being questioned. Again, not sitting on plateaus is understandable but pushing to thresholds based on what their diagnosis is, not by what the patient needs is just wrong***."

In addition to discussions about increasing the number of therapy visits performed to increase revenue, Gentiva management discussed expanding therapy intensive specialty programs. An Excel spreadsheet listed "Specialty Programs (Orthopedics) increasing visits" as a means to increase revenue in the face of the 2008 CMS changes.

CEO Tony Strange wrote in a July 29, 2008 e-mail that, "Amedisys is on our heals [sic] related to growth in Specialties. I want to see us kick it up a notch related to launches. Especially, in the programs that drive high % Medicare growth."

### E.    Defendants' Materially False And Misleading Statements During

### **The Relevant Period**

101.   On July 31, 2008, Defendants caused the Company to issue a press release announcing its second quarter 2008 financial results.  Defendants reported net income of $12.0 million, or $0.41 diluted EPS, and revenue of $346.2 million for the quarter ended June 29, 2008.  The release further stated in part:

> "Gentiva has generated a strong first half that puts us well on track to achieve our goals for the year," said Chairman and CEO Ron Malone. "We are building our Home Health segment with a focus on growing Medicare admissions, expanding our pioneering specialty programs, and increasing our capacity both organically and through acquisitions, including two transactions completed so far this year.  We also saw sequential improvement at both CareCentrix and within our Other Related Services segment.
>
> "These achievements, along with the stable reimbursement outlook indicated in the recently passed Medicare legislation, position Gentiva for continued strength in performance through the balance of 2008 and lead us to increase our financial outlook for the year."

102.   On this positive news, Gentiva's stock increased $3.13 per share or 14%, to close at $25.54 per share on July 31, 2008.

103.   On August 7, 2008, Defendants caused the Company to file its Form 10-Q with the SEC for the fiscal quarter ended June 29, 2008, which included the same financial results previously reported in the Company's July 31, 3008 press release.  The Form 10-Q also included certifications executed pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") by defendants Malone and

- 45 -

Potapchuk, which stated:

1. I have reviewed this quarterly report on Form 10-Q of Gentiva Health Services, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance

- 46 -

regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

104.   On October 30, 2008, Defendants caused the Company to issue a press release announcing its third quarter 2008 financial results.   Defendants reported net income of $120.9 million, or $4.07 diluted EPS, and revenue of $347.6 million for the quarter ended September 28, 2008.   The release further stated in part:

> "Our Home Health segment had an outstanding third quarter, continuing a trend of solid gains," said Gentiva Chairman and CEO Ron Malone.   "This performance results from continued growth and margin expansion while we invest in our specialty programs and add new tools to benefit our patients and the dedicated clinicians who serve them."

105.   On November 7, 2008, Defendants caused the Company to file its Form 10-Q with the SEC for the fiscal quarter ended September 28, 2008.   The Form 10-Q contained the same results reported in the Company's October 30, 2008 press release.   In addition, the Form 10-Q contained SOX Certifications by defendants Malone and Potapchuk substantially similar to those quoted above.

106.   On February 18, 2009, Defendants caused the Company to issue a press release announcing its fourth quarter and fiscal year 2008 financial results. Defendants reported net income of $12.8 million, or $0.43 diluted EPS, and net revenues of $282.9 million for the quarter ended December 28, 2008.   Further, Defendants reported net income of $153.5 million, or $5.21 diluted EPS, and net revenues of $1.3 billion for the full year ended December 28, 2008.   The release

further stated in part:

> "We achieved our results both for the fourth quarter and all of 2008
> while focusing on two key objectives: delivering clinical excellence to
> a more acute patient population and positioning our Company as the
> employer of choice for clinicians," said Gentiva CEO Tony Strange.
> "During the fourth quarter we continued the launch of innovative
> specialty care programs across our branch network and again achieved
> strong performance in the hiring of new clinicians.  Gentiva will
> continue to address the needs of the nation's growing senior
> population, for which home healthcare is a cost-effective and patient-
> preferred solution for the nation's healthcare challenges."

107.   On March 12, 2009, Defendants caused the Company to file its Form
10-K with the SEC for the fiscal year ended December 28, 2008.  The Form 10-K
contained the same results previously reported in the Company's February 18,
2009 press release and was signed by defendants Strange, Potapchuk, Ganzi,
Malone, Olsten, Troubh, and Windley.  In addition, the Form 10-K contained SOX
Certifications by defendants Strange and Potapchuk substantially similar to those
quoted above.

108.   On April 30, 2009, Defendants caused the Company to issue a press
release announcing its first quarter 2009 financial results.  Defendants reported net
income of $18.0 million, or $0.60 diluted EPS, and revenue of $288.9 million for
the quarter ended March 29, 2009.  The release further stated in part:

> "Gentiva is off to a good start to 2009, both financially and
> operationally," said Gentiva CEO Tony Strange.  "Our results for the
> quarter were again led by our Home Health segment as we focus on

meeting the needs of the nation's growing senior population, for which home healthcare is a cost-effective and patient-preferred solution. The aggregate results of our other businesses also showed improved performance in the quarter, primarily driven by growth in hospice. Based on these solid first quarter results and our confidence that the Company will continue to execute on its strategy during the remainder of the year, we are today reaffirming our revenue and earnings outlook for 2009."

109.   On May 8, 2009, Defendants caused the Company to file its Form 10-Q with the SEC for the fiscal quarter ended March 29, 2009.  The Form 10-Q contained the same results set forth in the Company's April 30, 2009 press release. In addition, the Form 10-K contained SOX Certifications by defendants Strange and Potapchuk substantially similar to those quoted above.

110.   On July 30, 2009, Defendants caused the Company to issue a press release announcing its financial results for the second quarter of 2009.  Defendants reported net income of $17.1 million, or $0.58 diluted EPS, and revenue of $298.1 million for the quarter ended June 28, 2009.  The release further stated in part:

"Gentiva had a very good second quarter driven by continued success in executing our core strategies: rolling out our specialty programs, serving the needs of higher acuity seniors and increasing both the capacity and productivity of our growing clinician base," said Gentiva CEO Tony Strange.  "Our performance demonstrates the commitment of our employees as well as the growing belief of the healthcare community in the power of home care as a key part of the solution to the nation's healthcare challenges."

111.   On August 7, 2009, Defendants caused the Company to file its Form

10-Q with the SEC for the fiscal quarter ended June 28, 2009.  The Form 10-Q contained the same results previously reported in the Company's July 30, 2009 press release.   In addition, the Form 10-Q contained SOX Certifications by defendants Strange and Potapchuk substantially similar to those quoted above.

112.   On October 29, 2009, Defendants caused the Company to issue a press release announcing its financial results for the third quarter of 2009. Defendants reported net income of $15.4 million, or $0.52 diluted EPS, and revenue of $295.6 million for the quarter ended September 27, 2009.  The release further stated in part:

> "Gentiva continues to execute well on its business strategy and we are well on track to achieve our full year 2009 financial outlook, with expectations toward the higher end of the earnings range," said Gentiva CEO Tony Strange. "Growth trends in both our Home Health and Hospice business units remain solid as we intensify our focus on serving the needs of the nation's growing high-acuity senior population.  We are delivering on the key initiatives that will grow our company, including increasing the penetration of our specialty care programs, recruiting and retaining the best caregivers in the business, and operating efficiently, with a strong balance sheet."

113.   On November 6, 2009, Defendants caused the Company to file its Form 10-Q with the SEC for the fiscal quarter ended September 27, 2009.  The Form 10-Q contained the same results as previously reported in the Company's October 29, 2009 press release.   In addition, the Form 10-Q contained SOX Certifications by defendants Strange and Potapchuk substantially similar to those

quoted above.

114.   On February 18, 2010, Defendants caused the Company to issue a press release announcing its fourth quarter and fiscal year 2009 financial results. Defendants reported net income of $19.0 million, or $0.63 diluted EPS, and revenue of $310.0 million for the fiscal quarter ended January 3, 2010.  Further, Defendants reported net income of $69.8 million, or $2.34 diluted EPS, and net revenues of $1.15 billion for the full year ended January 3, 2010.  The release further stated in part:

> "Gentiva finished 2009 with strong fourth quarter results, and we have set the stage for solid growth in 2010 as well," said Gentiva CEO Tony Strange.  "We have done that by executing on core strategic initiatives and narrowing our focus to our home health and hospice operations.  We enter 2010 with a business that is performing well and a strong balance sheet that gives us the financial flexibility to invest both internally and externally in initiatives that will further solidify our industry leadership."

115.   On March 17, 2010, Defendants filed the Company's Annual Report on Form 10-K with the SEC for the fiscal year ended January 3, 2010.  The Form 10-K contained the same results as previously reported in the Company's February 18, 2010 press release and was signed by defendants Strange, Potapchuk, Ganzi, Lochner, Malone, Olsten, Retchin, Troubh, and Windley.  In addition, the Form 10-K contained SOX Certifications by defendants Strange and Potapchuk substantially similar to those quoted above.

116.   On April 14, 2010, Gentiva's stock reached its Relevant Period high, closing at $30.50 per share.

117.   On May 6, 2010, Defendants caused the Company to issue a press release announcing its first quarter 2010 financial results.  Defendants reported net income of $9.3 million, or $0.31 diluted EPS, and revenue of $297.1 million for the quarter ended April 4, 2010. The release further stated in part:

> "Gentiva's solid first quarter performance was driven by patient admission growth of more than 10% and improving profitability as we continue to narrow our strategic focus to our home health and hospice operations," said Gentiva CEO Tony Strange.  "The recent passage of health care reform legislation brings with it clarity on reimbursement for the next several years and we will continue to work closely with policymakers on future refinements to these regulations as they are implemented."

118.   On May 13, 2010, Defendants caused the Company to file its Form 10-Q with the SEC for the fiscal quarter ended April 4, 2010.  The Form 10-Q contained the same results previously reported in the Company's May 6, 2010 press release.  In addition, the Form 10-Q contained SOX Certifications by defendants Strange and Potapchuk substantially similar to those quoted above.

### F.   The Truth Begins To Emerge

119.   On May 13, 2010, the *WSJ* reported that Gentiva was the target of an investigation by the Finance Committee.  According to the *WSJ*, the Finance Committee had launched an investigation into the practices of companies that

provide in-home therapy visits reimbursed by Medicare to determine "whether the companies deliberately boosted the number of home therapy visits to trigger higher Medicare reimbursements."   The Finance Committee requested information regarding Gentiva's home therapy visits from 2006 through 2009.

120.   On May 13, 2010, Gentiva's shares declined by $2.20 per share to close at $27.55 per share - a drop of 7%.

121.   Critically, this was not the first time that the Company had come under fire on Defendants' watch and under their direction for violating the applicable rules and regulations pertaining to Medicare.   In 2003 and 2004,[3] the Company received subpoenas concerning its treatment on cost reports of employees engaged in sales and marketing efforts, based on allegations that Gentiva had fraudulently billed Medicare for costs not covered by the program. Ultimately, in June 2011, Defendants caused the Company to reach a settlement agreement with the OIG and the DOJ.   Pursuant to that settlement, the Company was forced to pay the government a total of ***$12.5 million***, and the DOJ stated in a press release that its "investigation established that, through its annual submission of cost reports to Medicare for the years 1998 through 2000, Gentiva improperly billed Medicare for salaries and other costs of employees performing sales

---

[3] Notably, defendants Malone, Ganzi, Olsten, and Troubh have each served on the Board since 2002 or earlier.

functions that were designed to increase patient utilization." Accordingly, Defendants' attempts to improperly "game" Medicare have been going on for years despite the fact that they were well-aware of (and had consistently warned of) the inherent risks and damages such conduct could cause the Company.

122. On May 14, 2010, Defendants caused the Company to issue a press release entitled "Gentiva Health Services Comments on Senate Finance Committee Requests," in which they denied all wrongdoing. Notably, Defendants' swift public denial of wrongdoing occurred before any meaningful investigation could have occurred, and indeed, the Board did not indicate that it would undertake, or cause to be undertaken, an independent internal investigation. Defendants' May 14, 2010 press release stated:

> ATLANTA, May 14, 2010 /PRNewswire via COMTEX News Network/ -- Gentiva Health Services, Inc. (Nasdaq: GTIV), a leading provider of home health and hospice services, announced that it is reviewing a letter that it has been sent by the Senate Finance Committee to all of the publicly traded home healthcare companies and were mentioned in a recent Wall Street Journal article. The letter requests that the companies provide various data related to the utilization of services. Gentiva will cooperate with the Committee's requests.

> "We welcome this opportunity to better inform the members of the Committee and broader audiences about the important role that home care plays in addressing the needs of our nations' growing senior population, " said Tony Strange, CEO and President. "Home healthcare is a cost-effective, clinically sophisticated service that treats seniors where they prefer to receive their care, in their homes. *I*

- 55 -

*am proud of the care that our thousands of home healthcare clinicians provide to patients each and every day, as well as the measures that Gentiva takes to ensure its appropriateness*."

123. On May 26, 2010, the Finance Committee requested supplemental information from the Company relating to Gentiva's "compliance program, policies and procedures, and billing manuals."

124. On July 13, 2010, Defendants caused the Company to issue a press release disclosing that the SEC had likewise commenced an investigation relating to Gentiva's participation in the Medicare Home Health Prospective Payment System.  The release stated in part:

> The Company separately announced that today it has been informed by the Securities and Exchange Commission that the Commission has commenced an investigation relating to Gentiva's participation in the Medicare Home Health Prospective Payment System (HH PPS). The Company believes the investigation is similar to the Commission's ongoing investigations and the Senate Finance Committee inquiry previously disclosed by some home health companies.   The Commission requested that the company preserve all documents from January 1, 2000 to the present relating to its participation in the HH PPS and was further advised that a subpoena would be forthcoming in the next few days.  The Company plans to comply with the document request and cooperate with the investigation.

125. On this news, Gentiva's stock declined $0.31 per share to close at $21.99 per share on July 14, 2010.

126. Notably, even after the SEC announced that it too had commenced an investigation into the Company's practices, the Board still failed to initiate any

independent internal investigation whatsoever.

127.   Then, on July 20, 2010, after the market closed, Defendants caused the Company to issue a press release announcing its preliminary financial results for the second quarter of 2010.   Defendants reported income of approximately $22.6 million, or $0.74 diluted EPS, and revenue of approximately $297 million for the quarter ended July 4, 2010.   Defendants caused the Company to further reduce its full-year revenue guidance, stating in part:

> Gentiva reaffirmed its 2010 full-year outlook for adjusted income from continuing operations of $2.67 to $2.75 on a diluted share basis. However, in light of recent softness in home health episodic volumes and the anticipated seasonality in third quarter volumes as experienced by the Company historically, Gentiva has reduced its full-year revenue guidance to a range of $1.20 billion to $1.23 billion from its prior guidance of between $1.23 billion to $1.26 billion.

128.   On this news, Gentiva's stock dropped $1.64 per share to close at $19.96 per share on July 21, 2010, a one-day decline of 8%.

129.   Notably, the prior announcement of the SEC investigation was a disastrous announcement for the Company because, as a result of Defendants' illegal scheme, the Company was previously able to meet or beat consensus analyst earnings estimates for every quarter from the second quarter of 2008 until the first quarter of 2010.

130.   Over the course of the next year, however, at least in part because

- 57 -

Defendants' illicit Medicare scheme had been exposed publicly and could no longer continue to be perpetrated, the Company's financial results, and accordingly its stock price, suffered greatly.  For example, on August 1, 2011, after the market closed, Defendants revealed that the Company's net income for the second quarter of 2011 had declined by *73%* from the same quarter just one year earlier, and announced substantially reduced guidance as well.  On this news, over the next ten days, the Company's stock price was sliced by nearly *two thirds*, from its opening price of $17.90 per share on August 1, 2011 to just $6.10 per share on August 10, 2011.  The worst was yet to come, however.

131.   On October 3, 2011, the *WSJ* issued an article entitled "Home-Health Firms Blasted."  The article revealed the results of the investigation by the Finance Committee (discussed in detail above), which confirmed that Defendants had caused the Company to take advantage of the Medicare reimbursement system by manipulating the number of in-home therapy visits a patient received in order to raise revenues.  The Finance Committee's report said those alleged practices, at best, "represent abuses" of the Medicare program.  "At worst," it said, "they may be examples of for-profit companies defrauding" the program at taxpayers' expense.  The *WSJ* article stated, in part:

> At Gentiva, the report said, a spreadsheet analyzing Medicare's 2008 reimbursement changes showed that the company would earn $11

million more from the federal program if "therapy visits provided increased 2 to 4 visits to reach 6- and 14-visit plateaus."

*Another internal analysis of the coming reimbursement changes emailed to Gentiva Chief Executive Tony Strange on Sept. 7, 2007 stated that "increasing therapy visits by an average of 2 visits" per patient "will increase revenue by approximately $350 to $550 per episode" of care.*

After the 2008 reimbursement change, the number of Gentiva patients who received 10 visits declined by 24%, while the number of patients who received either 14 or 20 visits rose by 21% and 29%, respectively, according to the report.

132.   Thus, as of September 7, 2007 (at the latest), Defendants were on notice of how to abuse the Medicare program.

133.   And, incredibly, even in the wake of the Finance Committee's damning findings and the media backlash, Defendants, including the Board, have continued to publicly proclaim their "innocence" despite having **never** conducted or causing to be conducted an independent internal investigation.  Indeed, in the Company's most recent Quarterly Report on Form 10-Q filed with the SEC on November 9, 2011, Defendants stated: "We maintain our belief that we have provided and are providing the highest quality of care and have received and continue to receive payment within the standards set forth by the reimbursement system established by CMS."

134.   The Board's failure to investigate, all while publicly proclaiming

"innocence," even after the results of the SFC Report were revealed, is inexplicable and inexcusable.  The Board was duty-bound under Delaware law to properly inform itself of the Company's problems when put on notice of them and the Board has, at literally every single turn, refused to do so.  And indeed, the SFC Report shows why the Board has resisted its duties, as the SFC Report specifically implicates two of its members – Strange and Malone.  The Board's failure to properly inform itself of the veracity of the allegations underlying the Finance Committee's and SEC's investigation, and contained in the SFC Report, is a separate breach and distinct breach of fiduciary duty and excuses any demand on the Board.

135.   On this news, Company's stock further declined from $5.50 per share to close at $3.65 per share on October 4, 2011.

136.   And, news regarding the Company's vast legal and regulatory issues only got worse when, on February 21, 2012, it was announced that the Company had entered into a *$25 million* settlement with the DOJ and signed a corporate integrity agreement regarding the Company's wholly-owned subsidiary Odyssey HealthCare Inc. ("Odyssey").  Specifically, the settlement involved continuous care services from January 2006-January 2009 performed by Odyssey.  On February 21, 2012, Defendants announced the settlement in a Form 8-K:

(a)(1) Settlement Agreement

On February 15, 2012, Odyssey HealthCare, Inc. ("Odyssey"), a wholly-owned subsidiary of Gentiva Health Services, Inc. (the "Company"), entered into a settlement agreement (the "Settlement Agreement") with the United States, acting through the United States Department of Justice and on behalf of the Office of Inspector General of the Department of Health and Human Services, that resolves the investigation regarding Odyssey's provision of continuous care services prior to the Company's acquisition of Odyssey in August of 2010.

Pursuant to the Settlement Agreement, Odyssey will pay the United States $25 million within seven days following the effective date of the Settlement Agreement. The action has been filed under seal as a matter of law in the first instance, thereby preventing disclosure to the public except by court order.

(2) Corporate Integrity Agreement

Odyssey entered into a five-year Corporate Integrity Agreement (the "CIA") with the Office of Inspector General of the United States Department of Health and Human Services, which became effective on February 15, 2012, concurrent with the execution of the Settlement Agreement. Although the covered conduct relates to services prior to the Company's acquisition of Odyssey, the CIA, for operational and organizational consistency, will relate to all of the Company's hospice operations.

Corporate Integrity Obligations: Odyssey must maintain its compliance officer and its compliance committee, which must be chaired by the compliance officer and meet at least quarterly. Odyssey must also provide general and special training for covered persons, which includes all employees of Odyssey and certain employees of the Company. Within 90 days after the effective date of the CIA, Odyssey must engage an accounting, audit or consulting firm to perform verification and unallowable cost reviews. In addition, Odyssey's eligibility review team must review the eligibility of

Odyssey's Medicare beneficiaries for the hospice services those beneficiaries received and prepare an eligibility review report.

Changes to Business Units or Locations: In the event that Odyssey changes locations, closes a business unit or location, purchases or establishes a new business unit or location, or sells any or all of its business units or locations, Odyssey must provide the Office of Inspector General with at least 30 days' notice.

Implementation and Annual Reports: Within 120 days of the effective date of the CIA, Odyssey must provide a written report to the Office of Inspector General summarizing the status of its implementation of the requirements of the CIA. In addition, Odyssey must submit to the Office of Inspector General annually a report with respect to the status of, and findings regarding, Odyssey's compliance activities.

137. Despite the release of its October 3, 2011 report, the Finance Committee investigation remains ongoing, as does the SEC investigation, and the Company faces potentially massive liability in connection with these inquiries.

138. The true facts, which were known by Defendants, but they failed to disclose during the Relevant Period, were as follows:

    a. Defendants improperly caused or permitted the Company to increase the number of in-home therapy visits to patients for the improper purpose of triggering higher reimbursement rates under the Medicare system, which ultimately resulted in the Company becoming the target of investigations by the Committee and the SEC; and

- 62 -

b.  Gentiva's purported strong revenue growth was not due solely to "organic growth" from real end-market demand as portrayed by defendants, but rather was at least in part due to the manipulation of the number of in-home therapy visits Gentiva patients received in order to reach the threshold reimbursement levels set by Medicare.

139.   The price of the Company's stock has never recovered from these events, and currently trades for under $8 per share – less than one-third of its Relevant Period high.

140.   Accordingly, as a result of Defendants' breaches of fiduciary duty and other misconduct, the Company has been damaged.

## GENTIVA'S TOP EXECUTIVES, INCLUDING CERTAIN DEFENDANTS, ARE OVER-COMPENSATED AND UNJUSTLY ENRICHED DURING THE RELEVANT PERIOD

141.   Before Defendants' scheme finally came to light, the Compensation Committee Defendants approved awards of valuable financial benefits, including salaries, bonuses, and other compensation, to the Company's senior officers. These individuals included certain of Defendants, and in particular, those individuals whose knowledge of the scheme to "game" Medicare was revealed in October 2011 by the SFC Report – Strange and Malone.  This valuable financial

compensation was based on the Company's purported strong financial performance during the Relevant Period, which, of course, was the result of the illegal scheme described herein.

142. Indeed, in the Company's Proxy Statement filed with the SEC on April 4, 2011 (the "Proxy"), the Compensation Committee Defendants represented that "[o]ur executive compensation program is intended to…align the interests of our executive officers with the interests of our shareholders."

143. Thus, it is clear that a substantial portion of the executive compensation awarded at Gentiva during the Relevant Period was based on purported strong financial results, which were only achieved as a result of the illegal scheme detailed herein.

144. Specifically, according to the Company's Proxy, certain of the Company's senior officers were overcompensated from 2008-2010 as follows:

| Name | Year | Salary ($) | Bonus ($)[4] | Stock and Option Awards ($) | All Other Compensation | Total Compensation ($) |
|---|---|---|---|---|---|---|
| Malone | 2010 | 753,753 | 120,000 | - | 42,858 | 916,611 |
| | 2009 | 762,329 | 1,250,000 | - | 138,787 | 2,151,116 |
| | 2008 | 748,846 | 750,000 | 631,500 | 142,140 | 2,272,486 |
| Strange | 2010 | 721,096 | 1,435,000 | 3,125,698 | 190,533 | 5,472,327 |
| | 2009 | 634,247 | 1,250,000 | 2,036,813 | 121,498 | 4,042,558 |

---

[4] "Bonus" refers to both the "Bonus" and "Non-Equity Incentive Plan Compensation" awarded according to the Proxy.

|  | 2008 | 499,047 | 500,000 | 442,050 | 87,571 | 1,528,698 |
| Potapchuk | 2010 | 358,666 | 230,000 | - | 94,721 | 710,387 |
|  | 2009 | 422,707 | 510,000 | 439,500 | 95,443 | 1,467,650 |
|  | 2008 | 399,423 | 375,000 | 315,750 | 78,832 | 1,169,005 |

145.   Notably, these senior officers – defendants Malone, Strange, and Potapchuk – participated in or consciously permitted the Company's illicit scheme, which artificially inflated its revenues and, in turn, artificially inflated the compensation they each received.   Accordingly, defendants Malone, Strange, and Potapchuk were unjustly enriched at the expense of Gentiva and Gentiva's shareholders.

## DEFENDANTS CAUSED GENTIVA TO ISSUE THE MATERIALLY FALSE AND MISLEADING PROXY

146.   On April 4, 2010, Defendants caused Gentiva to disseminate to shareholders the Proxy in connection with the Company's annual shareholder meeting.   Defendants drafted, approved, reviewed and/or signed the Proxy before it was filed with the SEC and disseminated to Gentiva shareholders.   Defendants knew, or were deliberately reckless in not knowing, that the Proxy was materially false and misleading.

147.   In the Proxy, the Board issued the materially false and misleading statements in the Audit Committee report that "[t]he Audit Committee has reviewed and discussed the audited consolidated financial statements of Gentiva

and its subsidiaries and its internal control over financial reporting with management and with PricewaterhouseCoopers, LLC.   Based on all of the foregoing reviews and discussions with management and PricewaterhouseCoopers LLP, the Audit Committee recommended that the audited consolidated financial statements be included in our Annual Report on Form 10-K…."

148.   Defendants' statements in the Proxy were false and misleading because the Audit Committee "blessed" the Company's financial statements and its internal controls even though a substantial portion of the Company's revenues were based on improper and illegal activities, which was unknown to shareholders.

## DERIVATIVE AND DEMAND ALLEGATIONS

149.   Plaintiffs bring this action derivatively in the right and for the benefit of Gentiva to redress the breaches of fiduciary duty and other violations of law by Defendants.

150.   Plaintiffs will adequately and fairly represent the interests of Gentiva and its shareholders in enforcing and prosecuting its rights.

151.   At the time the action was initiated, the Board consisted of the following nine (9) directors: defendants Strange, Malone, Forman, Ganzi, Lochner, Olsten, Retchin, Troubh, and Windley.   Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile,

wasteful and useless act, for the following reasons:

**A.    Demand Is Excused Because The Board's Conduct Is Not A Valid Exercise Of Business Judgment**

152.    As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread violations of applicable law.  Breaking the law is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment.  Defendants also knowingly, in reckless disregard of their fiduciary duties, or at a minimum with gross negligence, participated in the covering up of the Company's systematic manipulations of its Medicare billing practices.  Accordingly, demand on the Board is excused.

153.    A derivative claim to recoup damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of the Board's business judgment—conduct for which Defendants face potential personal liability.  Simply put, violating the law, approving the violations of applicable law by others, or looking the other way while refusing to prevent others under the Board's control from violating the law are all forms of misconduct that cannot under any circumstances be examples of legitimate business conduct. The protections of the "business judgment rule" do not extend to such malfeasance. Nor can such malfeasance ever constitute the "good faith" required of corporate

fiduciaries.

154.   Moreover, each member of the Board directly made and/or caused the company to disseminate improper, materially false and misleading public statements concerning, among other things, the source of the Company's purported success and the adequacy of the Company's internal controls.   For the reasons stated herein, the Board knew or should have known about the pervasive scheme at the Company involving manipulation of the number of visits provided to patients to increase Medicare reimbursements.   In addition, when deciding whether to sign or approve statements to be publicly disseminated, the Board was also bound by their duty of care to inform themselves of all reasonably-available material information.   The statistics concerning the clustering at Medicare's bonus payment thresholds was both reasonably available and material.   Among other things, it implicated violations of federal law that could cause the Company to lose its primary source of revenue and face substantial fines.

155.   The Board's tacit or express approval for the continued manipulation of the visits to the Company's patients in order to improperly increase billings to Medicare, and their participation in the dissemination of improper public statements, cannot be regarded as a valid exercise of business judgment.

**B.      Demand Is Excused Because A Majority Of The Board Faces A Substantial Likelihood Of Liability**

156.   Even if knowingly presiding over multiple violations of applicable law could somehow fall within the ambit of the business judgment rule (which it does not), demand is also futile and excused because a majority of the Board is not disinterested because they face a substantial likelihood of liability for their conduct.

157.   Every member of the Board was aware of, or should have been aware of, numerous red flags regarding the Company's illegal visiting nurse practices.  In particular, as discussed above, on or around March 1, 2006, MedPAC submitted a report to Congress pursuant to its legislative mandate to evaluate Medicare payment issues and make specific recommendations.  Among other things, the report discussed the risk of Medicare abuse triggered by the prospective payment system as implemented in 2000.  The MedPAC report specifically states that: "*[t]hree reports from the Office of Inspector General indicate some agencies are providing more therapy than is medically necessary*."  Moreover, effective January 1, 2008, CMS changed the reimbursement thresholds from an additional $2,200 payment at the tenth episodic visit to additional payments at the sixth, fourteenth, and twentieth therapy visit thresholds.  MedPAC's March 2008 report to Congress left no doubt that these changes were intended to curb Medicare abuse

incentivized by the big bonus at the tenth visit.  Despite clearly being placed on notice of the problems surrounding "providing more therapy than is medically necessary," every member of the Board consciously disregarded their fiduciary duties to Gentiva when, under their direction, the Company continued to engage in these practices.  Accordingly, the entire Board faces a substantial likelihood of liability for ignoring this red flag that waved in their face.  Thus, demand is excused.

158.   Additionally, the entire Board faces a substantial likelihood of liability in connection with its failure to commence any form of an independent internal investigation in response to the SEC investigation and the SFC Report.  In particular, despite being placed on notice numerous times regarding the Company's Medicare violations, the Board has repeatedly and affirmatively denied the allegations contained therein.  Critically, despite these unequivocal denials of wrongdoing, upon information and belief, the Board failed to commence any internal investigation or otherwise properly inform themselves as they are duty-bound to do under Delaware law.  Accordingly, the entire Board breached its fiduciary duties and, thus, the entire Board faces a substantial likelihood of liability, which excuses demand.

159.   Defendants Malone and Strange each personally face a substantial

- 70 -

likelihood of liability in connection with their knowledge of illegal conduct occurring at the Company.  In particular, as discussed above, and as revealed by the SFC Report, both defendants Malone and Strange received an email in January 2007 stating that in response to the 2008 Medicare reimbursement change, the Company had created an internal group to "***determine whether revisions to [o]ur therapy protocols are clinically defensible***."   Hence, defendants Malone and Strange were on notice since at least the beginning of 2007 of the Company's illicit scheme to "game" Medicare.  Thus, defendants Malone and Strange breached their fiduciary duties by permitting the Company to break the law when they had direct, timely knowledge of it.   Accordingly, demand is futile regarding defendants Malone and Strange.

160.   During the Relevant Period, defendants Forman, Ganzi, Olsten and Troubh served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls. Additionally, the Audit Committee Defendants are required to oversee the Company's legal and regulatory compliance.  Defendants Forman, Ganzi, Olsten and Troubh breached their fiduciary duties of due care, loyalty, and good faith,

because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures.  Further, defendants Forman, Ganzi, Olsten, and Troubh allowed or permitted the Company to engage in the legal and regulatory failures discussed herein.  Therefore, defendants Forman, Ganzi, Olsten and Troubh each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

161.   During the Relevant Period, defendants Ganzi, Lochner, Olsten, and Troubh have served as members of the Compensation Committee.  Pursuant to the Compensation Committee's charter, the Compensation Committee Defendants are responsible for, *inter alia*, reviewing and approving compensation for the Company's senior executive officers in line with the compensation philosophy set forth in the Proxy.  The Compensation Committee Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Compensation Committee, *inter alia*, awarded the above-discussed compensation based on an illegal scheme, which artificially inflated the Company's so-called revenues and, in turn, artificially inflated the compensation awarded during the Relevant Period. Further, the Compensation Committee has done nothing to rectify its above failures even after Defendants' scheme came to light.   Therefore, the

Compensation Committee Defendants (if not the entire Board) each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

162.   At various points during the Relevant Period, defendants Forman, Lochner, Ganzi, Retchin, Malone, Olsten, and Troubh have served as members of the Quality Committee.  Pursuant to the Quality Committee's charter, directors on the Quality Committee are responsible for, *inter alia*, monitoring the Company's performance on established internal and external benchmarking regarding clinical performance and outcomes, facilitating the development of industry best practices based on internal and external data comparisons, and fostering enhanced awareness of the Company's clinical performance by the Board.  The Quality Committee Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Quality Committee, *inter alia*, permitted the Company to engage in the numerous violations of Medicare, and once placed on notice about them, failed to rectify any of the Company's past failures or to subsequently employ any "best practices."  Therefore, the Quality Committee Defendants (if not the entire Board) each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

163.   Finally, every member of the Board is required to comply with the

Code of Conduct.  The Code of Conduct states that "[c]ompliance with the law does not comprise [the Board's] entire ethical responsibility; rather, it is a minimum, absolutely essential conduction for performance of our duties."  Each member of the Board permitted individuals at all levels of the Company to engage in the illicit conduct described above, thereby abdicating their fiduciary duties to the Company, and severely damaging the Company.  Therefore, every member of the Board faces a substantial likelihood of liability for their breaches of fiduciary duties and any demand upon them is futile.

### C. Demand Is Excused Because A Majority Of The Board Lacks Independence

164.  The principal professional occupation of defendant Strange is his employment with Gentiva as its CEO, President and Chairman, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  For these reasons, according to the Proxy, the Board has admitted that defendant Strange is not an independent director.  Thus, defendant Strange admittedly lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

165.  The principal professional occupation of defendant Malone is his employment with Gentiva as its Executive Chairman, pursuant to which he has

received and continues to receive substantial monetary compensation and other benefits.   In addition, defendant Malone has served as a professional paid consultant to the Board since January 2011 and receives $15,000 per month ($180,000 per year) in compensation as a result.  For these reasons, according to the Proxy, the Board has admitted that defendant Malone is not an independent director.   Thus, defendant Malone admittedly lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

166.   Defendant Windley is a manager and has a 100% beneficial interest with RDW, which is an entity that the Company has leased an aircraft from in connection therewith, paid RDW almost *$600,000* in fiscal year 2010.  For these reasons, according to the Proxy, the Board has admitted that defendant Windley is not an independent director.   Thus, defendant Windley admittedly lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

167.  Due to their longstanding and close personal and professional relationships, defendants Forman, Ganzi, Malone, Olsten, and Troubh lack independence from each other and are incapable of impartially considering a

demand to commence and vigorously prosecute this action.   In particular, at various times, defendant Olsten previously served as the Vice Chairman, President, and Chairman of the Board of Directors of the Olsten Corporation, which was the parent corporation of Gentiva, from 1990 until 2000.  Further, from 1999 to 2000, defendant Malone served in various positions with the Olsten Corporation including Executive Vice President.  Additionally, defendant Troubh served as a director of the Olsten Corporation from 1993 until 2000.  Likewise, defendant Forman served as Executive Vice President of the Olsten Corporation from 1995 until 1997.  Finally, defendant Ganzi served as a director of the Olsten Corporation from 1998 until 2000.   Accordingly, due to their personal and professional relationships arising from their executive and directorial positions with the Olsten Corporation, defendants Olsten, Ganzi, Malone, Forman, and Troubh lack independence from each other and are incapable of considering a demand.

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY
## FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

168.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

169.   As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Gentiva disseminated

- 76 -

accurate, truthful and complete information to its shareholders.

170.   Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Gentiva shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

171.   As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
## AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT

172.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

173.   For purposes of this count only, Plaintiffs expressly disclaim any allegations of fraud.  This count, therefore, does not sound in fraud and is based upon the negligent conduct by the Defendants named herein.

174.   Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact

necessary in order to make the statements therein not false or misleading."   17 C.F.R. §240.14a-9.

175.   In the Proxy, the Board issued the materially false and misleading statements in the Audit Committee report that "[t]he Audit Committee has reviewed and discussed the audited consolidated financial statements of Gentiva and its subsidiaries and its internal control over financial reporting with management and with PricewaterhouseCoopers, LLC.   Based on all of the foregoing reviews and discussions with management and PricewaterhouseCoopers LLP, the Audit Committee recommended that the audited consolidated financial statements be included in our Annual Report on Form 10-K…."

176.   Defendants' statements in the Proxy were false and misleading because the Audit Committee "blessed" the Company's financial statements and its internal controls even though a substantial portion of the Company's revenues were based on improper and illegal activities, which was unknown to shareholders.

177.   In the exercise of reasonable care, Defendants should have known that the statements contained in the Proxy were materially false and misleading.

178.   The misrepresentations and omissions in the Proxy were material to Plaintiffs in voting on the Proxy.   The Proxy was an essential link in the accomplishment of the continuation of Defendants' violation of the Company's

compensation policies, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation, and the Company's compensation policies.

179.   The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the Proxy.

## COUNT III
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

180.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

181.   As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

182.   Defendants willfully ignored the obvious and pervasive problems with Gentiva's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

183.   As a direct and proximate result of the Defendants' foregoing

breaches of fiduciary duties, the Company has sustained damages.

## COUNT IV
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

184.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

185.   Defendants owed and owe Gentiva fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe Gentiva the highest obligation of good faith, fair dealing, loyalty and due care.

186.   Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

187.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Gentiva has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

188.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

189.   Plaintiffs, on behalf of Gentiva, has no adequate remedy at law.

## COUNT V
## AGAINST DEFENDANTS  STRANGE, MALONE, FORMAN, GANZI, LOCHNER, OLSTEN, RETCHIN, TROUBH, AND WINDLEY FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO INITIATE ANY INTERNAL INVESTIGATION OR OTHERWISE PROPERLY INFORM

## THEMSELVES IN RESPONSE TO NUMEROUS GOVERNMENTAL INVESTIGATIONS AND THE SFC REPORT

190.  Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

191.  Defendants Strange, Malone, Forman, Ganzi, Lochner, Olsten, Retchin, Troubh, and Windley,  as directors of Gentiva, owed and owe Gentiva fiduciary obligations.   By reason of their fiduciary relationships, Defendants Strange, Malone, Forman, Ganzi, Lochner, Olsten, Retchin, Troubh, and Windley specifically owed and owe Gentiva the highest obligation of good faith, fair dealing, loyalty and due care.

192.  Defendants Strange, Malone, Forman, Ganzi, Lochner, Olsten, Retchin, Troubh, and Windley each violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision because even though they had numerous opportunities to investigate or cause to be conducted an independent internal investigation into allegations of the Company's repeated illegal behavior in order to reasonably and properly inform themselves, they instead chose not to do so.

193.  As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Gentiva has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

194.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

195.   Plaintiffs, on behalf of Gentiva, have no adequate remedy at law.

## COUNT VI
## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

196.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

197.   By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Gentiva.

198.   Plaintiffs, as shareholders and representatives of Gentiva, seek restitution from these Defendants, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants from their wrongful conduct and fiduciary breaches.

## COUNT VII
## AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

199.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

200.   Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Gentiva, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing

Gentiva to misrepresent material facts regarding its financial position and business prospects.

201.   As a direct and proximate result of Defendants' abuse of control, Gentiva has sustained significant damages.

202.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

203.   Plaintiffs, on behalf of Gentiva, have no adequate remedy at law.

## COUNT VIII
## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

204.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

205.   Defendants had a duty to Gentiva and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Gentiva.

206.   Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Gentiva in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Gentiva's affairs and in the use and

preservation of Gentiva's assets.

207.   During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Gentiva to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Gentiva, thus breaching their duties to the Company.   As a result, Defendants grossly mismanaged Gentiva.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.   Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.   Directing Gentiva to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of

operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      C.    Awarding to Gentiva restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

      D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      E.    Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  March 5, 2012           Respectfully submitted,

**LAW OFFICE OF JOSHUA A. MILLICAN, P.C.**

*[signature]*

JOSHUA A. MILLICAN
Georgia Bar No. 508998
The Grant Building, Suite 607
44 Broad Street NW
Atlanta, GA 30303
Telephone: (404) 522-1152
Facsimile: (404) 522-1133

joshua.millican@lawofficepc.com

**THE WEISER LAW FIRM, P.C.**
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
22 Cassatt Avenue
First Floor
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062

**GLANCY BINKOW & GOLDBERG LLP**
LIONEL Z. GLANCY
MICHAEL GOLDBERG
EX KANO S. SAMS II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**LAW OFFICES OF HOWARD G. SMITH**
HOWARD G. SMITH
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

**Counsel for Plaintiffs**

## VERIFICATION

I, Siew K. Stevens, under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action.  I have read the foregoing Complaint and authorized its filing.  Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED: _____3/1 /2012_____          _____
                                    Siew K. Stevens

## PLAINTIFF'S VERIFICATION

I, Joe Cuzzola, hereby verify that I am familiar with the allegations set forth in the

foregoing Complaint and I have authorized the filing of the Complaint. The facts set forth in the

Complaint that relate to my acts and deeds are true as to my own knowledge. With respect to the

Complaint that relate to my acts and deeds are true as to my own knowledge. With respect to the facts set forth that are stated upon the investigation of my counsel, I believe them to be true to the best of my information and belief.

Dated: February _____, 2012

3.2-2012

_____
Joel Cuzzola

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this day, I electronically filed the within and foregoing VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT with the Clerk of Court in the United States District Court, for the Northern District of Georgia, Atlanta Division, using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

Dated: March 5, 2012.

By:   s/ Joshua A. Millican
Joshua A. Millican
Georgia Bar No. 508998
LAW OFFICE OF JOSHUA A. MILLICAN, P.C.
The Grant Building, Suite 607
44 Broad Street, N.W.
Atlanta, Georgia 30303
Telephone: (404) 522-1152
Facsimile: (404) 522-1133
joshua.millican@lawofficepc.com

**Counsel for Plaintiffs**